**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| ALAN JAMES WATSON, MICHAEL POTTS and CASH FLOW FINANCIAL LLC. | ) ) ) | CIVIL ACTION NO.: |
| Defendants, | ) ) ) | COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL PENALTIES UNDER THE |
| and | ) ) ) | COMMODITY EXCHANGE ACT, AS AMENDED, 7 U.S.C. §§1-25 |
| THE JEDBURGH GROUP, Relief Defendant. | ) ) ) | |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

## I. SUMMARY

1. From at least November 28, 2007 through present ("relevant period"), Defendants Alan James Watson ("Watson"), Michael Potts ("Potts"), and Cash Flow Financial LLC ("CFF"), fraudulently solicited and accepted at least $45 million from more than 600 individuals and entities to participate in a commodity pool to trade commodity futures contracts and securities.

2. Throughout the relevant period, in order to induce participation in the commodity pool, Watson, acting as an unregistered commodity pool operator ("CPO") and Potts as an unregistered associated person ("AP") of a CPO, failed to disclose material facts to actual and

1

prospective pool participants, including that Watson was misappropriating pool participant funds for personal use and using pool participant funds to pay principal and purported returns to existing pool participants in a manner typical of a Ponzi scheme.  Further, Watson and Potts made material misrepresentations, including that the commodity pool was profitable when it was not; and that all funds invested with CFF were being traded by an advisor named Trade LLC, when in fact they were deposited in a variety of instruments not authorized by CFF pool participants.

3.     To conceal Watson's trading losses, Ponzi scheme, and the misappropriations, Watson issued or caused to be issued false monthly statements and/or other reports.  These documents falsely reflected returns of at least 10% profit each month from trading commodity futures and/or securities on behalf of the pool using the Trade LLC program, and failed to reflect the substantial losses incurred as a result of Watson's use of CFF funds in non-Trade LLC schemes.

4.     Beginning in July 2009, after Trade LLC had ceased to do business, Watson issued additional false statements and omitted material information regarding the location and status of pool participant funds in order to conceal his investment losses, Ponzi scheme, and misappropriations.  He issued Schedule K-1's to pool participants for use in filing their tax returns that falsely reported profits on investment and falsely promised that funds would be returned in the near future.

5.     Through his ongoing conduct, Watson has engaged, is engaged, or is about to engage in acts and practices in violation of the anti-fraud provisions of Sections 4b(a)(2) and 4o(1)(A) & (B) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6(b)(a)(2) and 6o(1)(A) & (B) (2006), and Section 4b(a)(1) of the Act as amended by the Food, Conservation,

and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), § 13102, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. § 6b(a)(1).  Watson also used the means and instrumentalities of interstate commerce in conducting his business as a CPO of the commodity pool without being registered as such in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

6. Potts acted as an AP of a CPO, without being registered as such in violation of Section 4k(2), 7 U.S.C. § 6k(2) of the Act.  Further, Potts has engaged, is engaged, or is about to engage in acts and practices in violation of the anti-fraud provision of Section 4o(1)(B) of the Act, § 6o(1)(B) (2006).

7. At all times relevant and in regard to all conduct alleged herein, Watson and Potts were agents of CFF and acted within the scope of their employment.  As such, CFF is liable for Watson's and Potts' conduct pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2010).

8. Relief defendant The Jedburgh Group is not charged with violations of the Act. However, it received funds from Defendants in which it had no legitimate interest or entitlement and which were derived from Defendants' fraudulent acts.  The Jedburgh Group, therefore, must return and repay these funds.

9. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the Commission seeks civil monetary penalties and other equitable relief, including restitution to pool participants, disgorgement of Defendants' ill-gotten gains, a permanent trading ban, and such other relief as the Court may deem necessary or appropriate.

10.     Unless permanently restrained and enjoined by the Court, Defendants are likely to continue to engage in the illegal acts and practices alleged in this Complaint, as more fully described below.

## II.  JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order there under.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Defendants are found in, inhabit, or transact business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

## III.  PARTIES

**Plaintiff**

13.     **Plaintiff Commodity Futures Trading Commission** is a federal independent regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et  seq*. (2006), and the Regulations there under, 17 C.F.R. §§ 1.1 *et seq*. (2010).

**Defendants**

14.     **Defendant Cash Flow Financial LLC** is registered as a Limited Liability Corporation in Michigan and operates out of Clinton Township, Michigan.  CFF was never registered with the Commission as a CPO or in any other capacity.

4

15.     **Defendant Alan James Watson** is an individual who resides in Clinton Township, Michigan, and controls the day to day operations of the pool.  Watson has never been registered with the Commission as a CPO or in any other capacity.

16.     **Defendant Michael S. Potts** is an individual who resides in Mountville, Pennsylvania.  Potts solicited investors for CFF and assisted Watson with the day to day operations of the pool.  Potts has never been registered with the Commission as a CPO, AP or in any other capacity.

**Relief Defendant**

17.     **Relief Defendant The Jedburgh Group, also known as Jedburgh Group International, Inc.,** is a Florida corporation.  Its headquarters are in Longwood, Florida.  The Jedburgh Group was retained by Watson and CFF to provide investigative services and assist CFF in locating and recovering CFF pool participant funds invested by Watson in a variety of schemes.  The Jedburgh Group has thus far been successful in recovering at least $3 million of pool participant funds, which it is holding in an escrow account.

**Related Entity**

18.     **Trade LLC** is registered as a Limited Liability Corporation in Florida and operated out of Palm Beach Gardens, Florida.  Trade LLC was never registered with the Commission as a CPO or in any other capacity.  Trade LLC is the subject of a separate enforcement action brought by the Commission in the U.S. District Court for the Southern District of Florida.  *See CFTC v. Trade LLC*, No. 9:10-cv-80738-KAM (S.D. Fla.) (complaint filed June 22, 2010 alleging fraud and misappropriation).

## IV.  <u>FACTS</u>

### <u>Formation of the Pool</u>

19.     Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), defines a "commodity pool operator" as any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise and in connection therewith, has solicited, accepted or received funds, securities or property from others for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

20.     Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) (2010), defines an "associated person" of a CPO to mean any natural person associated with a CPO in the capacity of a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged.

21.     On or about January 28, 2004, Watson formed Cash Flow Financial as a Michigan limited liability company.

22.     By at least November 27, 2007, Watson and Potts began soliciting pool participants to participate in an "investment club" operated through CFF for the purpose of forming a commodity pool to be traded by a Florida-based entity called Trade LLC.

23.     Between November 27, 2007, and June 30, 2009, CFF had more than 600 pool participants throughout the United States and received at least $45 million in funds for trading and investment.

24.     Watson acted as the CPO of this pool.   As a CPO, Watson owed a fiduciary duty to disclose all material information to his clients, the CFF pool participants.

25.     Potts solicited pool participants and thereby acted as an AP of a CPO.  As an AP of a CPO, Potts owed a fiduciary duty to disclose all material information to his clients, the CFF pool participants.

26.     Watson and Potts solicited pool participants through instrumentalities of interstate commerce, including telephone lines, and received funds from such individuals through the mail and other instrumentalities of interstate commerce.

27.     The CFF Operating Agreement, which Watson and each pool participant signed and which sets forth the agreement between all CFF pool participants, states that Watson as CEO is granted

> the power and authority to open and manage one or more brokerage or investment accounts on behalf of CFF-LLC.  Notwithstanding this power and authority, such brokerage or investment accounts will be managed in accordance with an investment strategy proposed by the CEO, and approved by two-thirds majority of the Members ("Investment Strategy").

28.     The "Investment Strategy" as agreed to by the pool participants and posted on the CFF website was to pool their funds to trade futures and equities on an intraday basis with the aid of a system developed by Trade LLC.

29.     Watson, as CEO of CFF, provided trading advice to the pool regarding trading commodity futures and securities.  Under the agreement, all CFF expenses and any compensation to be paid to CFF and/or Watson, were to be paid from a 20% commission on all *profits* generated by the CFF pool's trading activity.

7

30.     Although Watson had represented that all pool participant funds would be traded using Trade LLC's program, Watson provided only a portion of the pooled funds to Trade LLC for the purpose of trading futures and/or securities.

31.     Contrary to the representation that all pool participants' funds would be traded using the Trade LLC program, Watson actually deposited a portion of the pool's funds in his own personal accounts opened under his own name at Alaron Trading Corporation, Account No. 5250xxxx (the "Alaron Account") and at TradeStation Securities, Account No. 2107xxxx (the "TradeStation Account").  Alaron and TradeStation are Futures Commission Merchants ("FCMs") registered with the CFTC.  Watson traded commodity futures, specifically E-mini S&P 500 futures, with pool participant funds in his personal Alaron and TradeStation Accounts.

32.     Watson also deposited a portion of pooled CFF funds in an account in CFF's name with TD Ameritrade, Account No. 788-90xxxx (the "TD Ameritrade Account"), for the purpose of trading securities.  Watson executed trades for the TD Ameritrade Account himself without CFF pool participant approval or notice.

33.     Throughout the entire period when Defendants accepted funds from pool participants, Defendants did not register in any capacity with the Commission.

**Fraudulent Solicitations**

34.     During the period November 27, 2007 through June 30, 2009, Watson and/or Potts directly and indirectly solicited more than $45 million from pool participants.

35.     Watson and Potts directly solicited pool participants through monthly conference calls and/or webinars occurring on the first Wednesday of each month beginning at least by May 2008.

36.     Watson and Potts directly solicited pool participants at an event held in Perrysburg, Ohio on or about September 5-6, 2008.

37.     Watson and Potts directly solicited pool participants at an open house hosted at Trade LLC's headquarters in Palm Beach Gardens, Florida, on March 28, 2009 – more than 2 weeks after Watson stopped depositing funds with Trade LLC.

38.     Watson directly solicited pool participants via promotional materials posted on the CFF website.

39.     Watson and Potts indirectly solicited pool participants through a series of "Executive Club Members" or "ECMs," who acted under Watson's and Potts' direction in identifying and soliciting new participants and were compensated in a manner similar to a multi-level marketing program.

40.     The CFF Operating Agreement stated that CFF pool participant funds would be traded using a trading program selected by the CEO and approved by a vote of two-thirds of the members.  The pool participants approved pooling their funds for trading in commodity futures and securities with Trade LLC.

41.     In all of the materials, e-mails, meetings, and webinars that Watson and Potts used to solicit pool participants, they represented that all CFF pooled funds would be traded using the Trade LLC programs.

42.     All of the pooled funds were to be traded  through one of two programs:

        a.  The "Loan Program" allowed pool participants to provide a short term "loan" (ranging from 3 to 9 months) to Trade LLC in return for a fixed rate of return of 2% to 4.5% each month.  Funds deposited for  the "Loan Program" were to be provided by CFF to Trade LLC to use for trading

futures and/or securities until CFF could accumulate enough funds to begin actively trading in its own account.  Watson represented to many of the pool participants that participation in the "Loan Program" was necessary in order to comply with federal statutes regarding investment clubs.

b.  The "Trading Program" purportedly generated higher rates of return for pool participants (*i.e.*, 8% to 10% monthly).  Watson represented that the funds deposited in the "Trading Program"  would be placed in a CFF account at Alaron, and Trade LLC would be given authority to execute trades in futures and/or securities in the account.  Watson further represented that Trade LLC would not be able to withdraw funds from the account.  This fact was emphasized as a way that pool participants could be assured that their money was actually being traded and could not be stolen by Trade LLC – a fact that was material to many CFF members who had previously been solicited by Watson and lost substantial sums of money by investing in a Ponzi-like scheme involving a fraudulent scheme known as Safevest LLC.

43.    Many pool participants initially deposited funds in the "Loan Program" and when the return of the principal and purported profit became due and payable by Trade LLC, Defendants persuaded them to roll those funds  over into the "Trading Program" with Trade LLC.

44.    At a minimum, Watson and/or Potts made the following false or misleading representations in his solicitations:

a. Watson falsely claimed to be in compliance with CFTC registration requirements, when he was not;

b. Watson and Potts falsely claimed that all of the funds deposited into the CFF pool would be employed in either the "Loan Program" or "Trading Program" with Trade LLC, when it was not;

c. Watson falsely claimed that the funds deposited in the "Trading Program" would not be provided directly to Trade LLC, but instead would be put in a brokerage account at Alaron, and Trade LLC would be given access and authority to execute trades in the account. These assertions were false because: (i) to the extent any funds were traded using the Trade LLC program, it was given directly to Trade LLC, (ii) no account was ever opened at Alaron in CFF's name, and (iii) Trade LLC was never given legal authority to access and execute trades in Watson's personal Alaron account or any account in Watson's or CFF's names;

d. Watson falsely claimed that he was allowing Trade LLC to trade futures using his own money to test their program, when in fact he used CFF pool participant funds to trade futures in an account in his own name and never legally gave Trade LLC discretionary trading authority over that account;

e. Watson falsely claimed that CFF was earning profits of at least 10% or more each month before fees, when it was not;

f. Watson falsely claimed in late May 2009 that he was going to stop accepting new pool participants effective June 1, 2009, because (i) he was in the process of hiring an accountant and needed a clean break to allow

them to take over the books, (ii) he wanted more time to find bigger and better "bonus type deals," and (iii) he wanted to prove once and for all that CFF was not a Ponzi scheme and could survive without additional infusions of cash.  In fact, Watson failed to provide an accounting to CFF pool participants and had started realizing the losses incurred through his various schemes and needed an immediate influx of cash before investors learned of his deception and stopped the money flow.

45.     In addition to making affirmative false statements, Watson and/or Potts omitted material facts from their clients, including but not limited to the following:

    a.   Watson and Potts failed to disclose that Watson began investing CFF pool participant funds in a variety of unauthorized schemes other than Trade LLC as early as March 2008.

    b.   Watson and Potts failed to disclose none of the funds deposited into the CFF pool on or after March 12, 2009 were traded by Trade LLC and instead were used in unauthorized schemes or otherwise misappropriated. Notably, during the March 28, 2009 open house hosted at Trade LLC's headquarters in Florida, Watson and Potts failed to disclose to prospective and current pool participants that Watson had stopped sending funds to Trade LLC two weeks earlier, or that he had previously filed a lawsuit on behalf of CFF in an attempt to recover funds invested in an unauthorized scheme wholly unrelated to Trade LLC.

    c.   Watson and Potts failed to disclose that the CFF pool was losing money, both through Watson's unapproved investments and through Trade LLC.

d.   Watson and Potts failed to disclose the fact that Potts was using pool participants' funds for his own personal use, including excessive salaries beyond the agreed upon 20% commission on pool participants' purported profits and for personal items and expenses.

e.   Watson and Potts failed to disclose the fact that Watson was using pool participants' funds to pay principal and purported profit returns to existing pool participants in a manner typical of a Ponzi scheme.

**Misappropriation**

46.   Watson misappropriated pool participant funds in a variety of ways.  Of the $45 million solicited, only $8.1 million was traded by Trade LLC.  The remainder was deposited in unapproved trading accounts or schemes, used to reimburse money lost by individuals in a prior Ponzi scheme involving Safevest LLC, used to reimburse current pool participants purported profits and principal without account for losses incurred by the pool, to pay excessive commissions to Watson, Potts and other ECMs, and for Watson's and his family's day to day living expenses.

47.   For example, Watson represented to existing and prospective pool participants that CFF would be paid a commission of 20% of the profits from the CFF pool's trading using the Trade LLC program.  CFF's operating expenses and compensation for Watson, Potts, and Executive Club Members, if any, was to be paid out of that 20% commission.  Watson, however, paid fees and commissions in excess of the 20% agreed upon to himself, Potts, and Executive Club Members, without respect to the profitability of CFF or the purported profitability of CFF pool funds.

48.   Potts received at least $165,000 from CFF pool participant funds.

49.     Watson paid his own personal expenses directly from the CFF bank account, including payments on the mortgage for his home, daily purchases of food and gas, regular ATM cash withdrawals, as well as purchases at places such as Smokers Express, Toys R Us, Kmart, and General RV Center.  Watson has misappropriated at least $1.1 million for his own use and that of his friends and family members.

50.     Watson misappropriated pool participant funds when he used them to return other pool participants deposits and reimburse other pool participants purported profits when little or no actual profits had been generated.

51.     Watson misappropriated pool participant funds when he returned funds that had been invested and lost in a prior Ponzi scheme involving Safevest.  Watson distributed at least $325,000 of pool participants' funds to non-pool participants as "return of principal" invested in Safevest.

52.     No futures accounts were ever funded and traded in CFF's name.

53.     Instead, Watson misappropriated CFF pool participant funds when he used them to open the Alaron and TradeStation accounts in his own name and for his own benefit.  Watson made investment decisions and actively traded futures in those accounts himself, as well as giving trading authority to unauthorized persons including a company known as Temple FX, which is not registered with the Commission, and an individual named Stanley Williams, who were not approved by CFF pool participants as required by the CFF Operating Agreement.

54.     Contrary to his representations and the marketing materials provided on the CFF website that all pool funds would be traded using the Trade LLC program, Watson only provided a small amount of pool funds directly to Trade LLC to be traded in futures and/or securities.

55.     Watson further misappropriated pool participant funds by investing participant funds in a variety of unauthorized investment schemes, including, but not limited to, the following:

a.      In July 2008, Watson invested $1 million of CFF pool participant funds in a California based scheme to invest in U.S. Treasury instruments with Blue Diamond Excavation, Olathe Mining Company and Sundial Investment Group LLC (*Watson and Cash Flow Financial LLC v. Blue Diamond Excavation, Inc.*, No. 8:10-cv-00459 (C.D. Cal.));

b.      In September 2008, Watson invested $650,000 of CFF pool participant funds in an Arizona based money leasing scheme operated by Charles Bruce Ferguson. *See Arizona v. Ferguson*, No. 64 SGJ (Ariz. Sup. Ct., Maricopa County).

c.      In October 2008, Watson invested $1 million of CFF pool participant funds in a California based money leasing scheme involving Soldado Corporation.  *See Watson and Cash Flow Financial LLC v. Soldado Corp.*, No. 10-CV-1394 (N.D. Cal.).

d.      Beginning in December 2008, Watson invested $4,850,000 of CFF pool participant funds in a money leasing scheme with Darlene Bishop and Paradize Funding Network in Texas.  *See Cash Flow Financial LLC v. Bishop*, No. 09-CV-00029 (W.D. Tex.).

e.      By at least June 2009, Watson invested approximately $3 million of CFF pool participant funds with a group of individuals and entities including Jason Meyer, M5 Enterprises LLC, Royal Sovereign Group, and 3 Hooligans Investment Properties in connection with a money leasing program for the purpose of ultimately investing in U.S.

15

Treasury instruments.  *See Cash Flow Financial LLC v. Meyer*, No. 2:09-CV-05002 (E.D.N.Y.).

56.     Watson invested CFF pool participant funds in additional unauthorized schemes that are not yet the subject of litigation.

57.     Watson did not begin disclosing the existence of these other investments until 2010, even though he initiated litigation on behalf of CFF to recover the funds as early as March 27, 2009.

**Fraudulent Account Statements**

58.     From at least November 27, 2007, when Watson began pooling CFF participant funds, until July 23, 2009, Watson issued monthly account statements to participants.  Those statements falsely indicated that the pool participants were profiting at a rate of 10% per month as a result of participating in the Trade LLC Trading Program.

59.     The statements reflected Promissory Note or Loan Program participation and "Trade" Program participation, but failed to disclose the other investments made by Watson with CFF pool participant funds.

60.     Watson knew that the account statements were untrue, or was reckless with regard to their truthfulness, because he was aware that (1) only a small portion of pool participant funds was actually traded using the Trade LLC program and (2) the pool was incurring significant losses as a result of Watson's investments in schemes unrelated to Trade LLC and was not profitable.

61.     Watson directed persons affiliated with Trade LLC to refrain from providing any statements directly to CFF pool participants and from providing information regarding the total

amount deposited with Trade LLC by the CFF pool in order to hide the unauthorized investments and substantial losses incurred by Watson.

**The Cover Up – Additional False Statements Defrauding Pool Participants**

62.     Throughout July 2009, many CFF pool participants requested withdrawals of their funds and/or profits.  Watson deflected those requests, claiming that he was unable to access CFF accounts because he was traveling with his family in an RV and driving cross-country.

63.     During this same time period, however, Watson charged his family's hotel stays at a Disney resort to the main CFF bank account, paid for RV expenses from the CFF bank account and executed wire transactions transferring more than $1.2 million out of the main CFF bank account to various sources.

64.     While Watson was away on vacation, Potts hosted the monthly meeting for pool participants and represented that everything was going fine and CFF's trading, which was being conducted by Trade LLC, was successful.

65.     In April and May 2010, Watson caused to be issued 2009 Schedule K-1's to CFF pool participants reflecting profits on investment through at least the end of May 2009, when he knew that CFF pool participants had not in fact profited, but instead had suffered substantial losses.  Potts assisted Watson with the preparation of the false 2008 Schedule K-1s.

66.     Throughout April and May 2010, Watson promised CFF pool participants a full accounting of pooled funds and repeatedly promised that funds would be returned in the near future.

## V.  VIOLATIONS OF THE ACT

### COUNT ONE

### Fraud in Connection with Futures Contracts (CFF and Watson)

**(Violations of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2006), and Section 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A) and (C))**

67.     Paragraphs 1 through 66 are re-alleged and incorporated herein.

68.     Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2006), make it unlawful for any person to cheat or defraud or attempt to cheat or defraud; or willfully deceive or attempt to deceive by any means whatsoever other persons in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the produce or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

69.     Section 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A) and (C), make it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person – (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for the other person.

70.     As alleged above, during the relevant period, Watson knowingly, willfully or with reckless disregard for the truth, violated Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C.

18

§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and in violation of Section 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008, among other things, (1) issuing false statements, including falsely claiming that all funds invested with CFF would be invested in an account for which Trade LLC had trading authority, but not direct access; (2) omitting material information, including the fact that Watson had invested more than half of CFF's funds in unauthorized schemes and had completely stopped sending any funds to Trade LLC on or after March 12, 2009; (3) misappropriating pool participant funds by using such funds to pay principal and purported returns to other pool participants; and (4) misappropriating pool participant funds for personal use.

71.     Watson acted as an agent of CFF when he violated the Act and, therefore, CFF, as his principal, is liable for his acts, omissions and failures in violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2006), with respect to conduct occurring before June 18, 2008, and in violation of Section 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A) and (C), with respect to conduct occurring on or after June 18, 2008, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2010).

72.     Each misrepresentation or omission of material fact, issuance of a false statement or report, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(i) and (iii) of the Act, 7 U.S.C. § 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Section 4b(a)(1)(A) and (C) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.

## COUNT TWO

### False Statements and Records in Connection with Futures Contracts (CFF and Watson)

### (Violations of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), and Section 4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(B))

73.     Paragraphs 1 through 66 are re-alleged and incorporated herein.

74.     Section 4b(a)(2)(ii) of the Act, 7 U.S.C. §§ 6b(a)(2)(ii) (2006), makes it unlawful for any person to willfully make or cause to be made to other persons false reports or statements, or willfully enter or cause to be entered for other persons false records in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the produce or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof.

75.     Section 4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(B), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record.

76.     As alleged above, during the relevant period, Watson knowingly, willfully or with reckless disregard for the truth, violated Section 4b(a)(2)(ii) of the Act, 7 U.S.C. §§ 6b(a)(2)(ii)

(2006), with respect to acts occurring before June 18, 2008, and in violation of Section

4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(B), with

respect to acts occurring on or after June 18, 2008, the effective date of the CRA by, among

other things using or causing to be issued false account statements and reports reflecting

positive returns for the pool of 10% or more each month as a result of the Trade LLC trading

program and which failed to disclose the other investments made by Watson.

77.     Watson acted as an agent of CFF when he violated the Act and, therefore, CFF, as

his principal, is liable for his acts, omissions and failures in violation of Section 4b(a)(2)(ii) of

the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), with respect to conduct occurring before June 18, 2008,

and in violation of Section 4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7

U.S.C. § 6b(a)(1)(B), with respect to conduct occurring on or after June 18, 2008, pursuant to

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17

C.F.R. § 1.2 (2010).

78.     Each issuance of a false statement or report, including but not limited to those

specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(ii)

of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008,

and Section 4b(a)(1)(B) of the Act as amended by the CRA, to be codified at 7 U.S.C. §

6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008.

## COUNT THREE

### Fraud By a Commodity Pool Operator

**(Violations of Section 4o(1)(A) & (B) of the Act, 7 U.S.C. § 6o(1)(A) & (B) (2006))**

79.     Paragraphs 1 through 66 are re-alleged and incorporated herein.

80.     During the relevant period, Watson acted as a CPO for the pool by soliciting, accepting or receiving funds from others and engaging in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in commodities for future delivery on or subject to the rules of a contract market.

81.     As alleged above, during the relevant period, Watson employed a device, scheme or artifice to defraud prospective and existing pool participants, or engaged in a transaction, practice or course of business that operated as a fraud or deceit upon prospective and existing pool participants in violation of Section 4o(1)(A) & (B) of the Act, 7 U.S.C. § 6o(1)(A) & (B) (2006), by (1) issuing false statements, including falsely claiming that all funds deposited with CFF would be traded in an account for which Trade LLC had trading authority, but not direct access; (2) omitting material information, including the fact that Watson had invested more than half of CFF's funds in unauthorized schemes and had completely stopped sending any funds to Trade LLC on or after March 12, 2009; (3) using or causing to be issued false account statements and reports reflecting positive returns for the pool of 10% or more each month as a result of the Trade LLC trading program and which failed to disclose the other investments made by Watson; (4) misappropriating pool participant funds by using such funds to pay principal and purported returns to other pool participants; (5) misappropriating pool participant funds for personal use; and (6) issuing false statements in order to hide the true nature of his fraud, including representations that all pool participants' funds were the subject of the Florida state action involving Trade LLC and could therefore not be returned until the conclusion of the litigation.

82.     Watson was acting as an agent of CFF when he violated the Act and, therefore, CFF, as his principal, is liable for his acts, omissions and failures in violation of Section

4o(1)(A) & (B) of the Act, 7 U.S.C. § 6o(1)(A) & (B) (2006), pursuant to Section 2(a)(1)(B) of

the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2010).

83.     Each misrepresentation or omission of material fact, issuance of a false statement

or report, and misappropriation, including but not limited to those specifically alleged herein, is

alleged as a separate and distinct violation of Section 4o(1)(A) & (B) of the Act, 7 U.S.C.

§ 6o(1)(A) & (B) (2006).

## COUNT IV

### Fraud by an Associated Person of a Commodity Pool Operator

### (Violations of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006)

84.     Paragraphs 1 through 66 are re-alleged and incorporated herein.

85.     During the relevant period, Potts acted as an AP of a CPO for the pool by

soliciting individuals to become pool participants in regard to a business that is of the nature of

an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in

commodities for future delivery on or subject to the rules of a contract market.

86.     As alleged above, during the relevant period, Potts engaged in conduct that

operated as a fraud or deceit upon prospective and existing pool participants in violation of

Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006), by (1) falsely representing that all of

the funds deposited with CFF were being traded by Trade LLC, which was not true; (2) falsely

representing that the CFF pool was generating profits including representing at the July 2009

monthly meeting that CFF was trading profitably with Trade LLC, which was not true; (3)

videotaping Trade LLC personnel purportedly trading and arranging for the footage to be

disseminated to pool participants and potential pool participants in order to induce additional

deposits when CFF had stopped sending any funds to Trade LLC for trading; (4) failing to

disclose that pooled funds had been misappropriated by Watson for his own personal use and for use in unapproved schemes; (5) soliciting other members to act as ECMs in order to solicit additional pool participants and deposits and representing to ECMs that they would be compensated based on a proportion of the profits earned by any deposits they generated and arranging for payments to ECMs based on the purported profitability of investments they solicited even though no actual profits were generated; and (6) assisting Watson with the preparation of the 2008 Schedule K-1's for pool participants, which falsely showed profits on deposits with CFF when in fact no profits were generated.

87.     Potts was acting as an agent of CFF when he violated the Act and, therefore, CFF, as his principal, is liable for his acts, omissions and failures in violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2010).

88.     Each misrepresentation or omission of material fact, issuance of a false statement or report, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006).

### COUNT FIVE

### Failure to Register As a Commodity Pool Operator and as an AP of a Commodity Pool Operator

### (Violations of Sections 4k(2) and 4m(1) of the Act, 7 U.S.C. §§ 6k(2) & 6m(1))

89.     Paragraphs 1 through 66 are re-alleged and incorporated herein.

90.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006), provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO.  Section 4k(2)

of the Act, 7 U.S.C. § 6k(2) (2006), in relevant part, makes it unlawful for any person to be associated with a CPO as a partner, officer, employee, consultant or agent in any capacity that involves the solicitation of funds for a participation in a commodity pool.

91.    As alleged, during the relevant period, Watson acted as a CPO within the meaning of Section 1a(5) of the Act, 7 U.S.C. § 1a(5) (2006), and used the mails, telephone services, or other instrumentalities of interstate commerce in connection with his business as a CPO while failing to register as a CPO in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006). As further alleged, during the relevant period, Potts acted an agent for a CPO in a capacity involving the solicitation of participants for the pool, while failing to register as an AP, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

92.    Watson and Potts were acting as agents of CFF when they violated the Act and, therefore, CFF, as their principal, is liable for their acts, omissions and failures in violation of Section 4m(1) and 4k(2) of the Act, 7 U.S.C. §§ 6m(1) & 6k(2) (2006), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2010).

## COUNT SIX

### Disgorgement of Funds from Relief Defendant (The Jedburgh Group)

93.    Paragraphs 1 through 66 are re-alleged and incorporated herein.

94.    Defendants have defrauded pool participants and misappropriated pool funds.

95.    Relief Defendant The Jedburgh Group was retained by CFF to recover funds diverted by Watson to which CFF pool participants were rightly entitled.

96.    The Jedburgh Group has recovered funds that were the subject of Defendants' fraudulent conduct and misappropriation, and have been temporarily unjustly enriched thereby.

97.     While The Jedburgh Group has been successful in protecting those funds from further misappropriation, it has no legitimate entitlement to or interest in the funds.

98.     The Jedburgh Group should be required to disgorge funds up to the amount they received resulting from Defendants' fraudulent conduct and misappropriation.

## VI.  **RELIEF**

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers, enter:

(a)  an order finding that Defendants violated: Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006); Sections 4b(a)(1)(A)-(C) of the Act as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C); and Sections 4o(1)(A) &(B), 4k(2), and 4m(1) of the Act, 7 U.S.C. §§ 6o(1)(A) & (B), 6k(2) and 6m(1) (2006);

(b)  an order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, including any successor thereof, from engaging in conduct violative of the sections of the Act that the Defendants have been alleged to have violated;

(c)  an order of permanent injunction prohibiting Defendants from engaging, directly or indirectly, in

1)       Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act as amended by the CRA, to be condicfied at 7 U.S.C. § 1a);

2)       Entering into any transactions involving futures, options, commodity options (as that term is defined in Regulation 32.1(b)(1)), 17 C.F.R. § 32.1(b)(1) (2010), (commodity options), and/or foreign currency (as described in Section 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the by the CRA, to be

26

codified at 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i)) (forex contracts) for their own personal account or for any account in which any of them has a direct or indirect interest;

3)      Having any futures, options, commodity options, and/or forex contracts traded on their behalf;

4)      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving futures, options, commodity options, and/or forex contracts;

5)      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any futures, options, commodity options, and/or forex contracts;

6)      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

7)      Acting as a principal (as that term is defined in Regulation 3.1(a)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010).

(d)  an order directing Defendants and the Relief Defendant, as well as any other person or entity associated with them, including any successor thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which

constitute violations of the Act, as described herein, and interest thereof from the date of such violations;

(e)  an order directing Defendants and the Relief Defendant, as well as any other person or entity associated with them, including any successor thereof, to make full restitution, pursuant to such procedure as the Court may order, to every pool participant whose funds were received by them as a result of acts and practices which constitute violations of the Act, as described herein, and interest thereon from the date of such violations;

(f)  an order requiring Defendants to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the higher of (1) triple the monetary gain to Defendants for each violation of the Act or (2) $130,000 for each violation of the Act on or between October 23, 2004 through October 22, 2008, and $140,000 for each violation of the Act on or after October 23, 2008; and

(g)  an order for such other and further remedial ancillary relief as the Court may deem appropriate.

Respectfully submitted on this 10th day of March, 2011,

U.S. COMMODITY FUTURES TRADING COMMISSION

_____/s/ Allison Baker Shealy_____

| | |
|---|---|
| ALLISON BAKER SHEALY (VA 46634; DC 478202) | BARBARA L. McQUADE |
| | United States Attorney |
| PAUL G. HAYECK (MA 554815) | PETER A. CAPLAN |
| JASON MAHONEY (DC 489276) | Assistant U. S. Attorney |
| U.S. Commodity Futures Trading Commission | 211 W. Fort Street, Ste. 2001 |
| Division of Enforcement | Detroit, MI 48226 |
| 1155 21st Street, N.W. | (313)226-9784 |
| Washington D.C. 20581 | peter.caplan@usdoj.gov |
| (202) 418-5000 | P-30643 |
| ashealy@cftc.gov | |
| phayeck@cftc.gov | |
| jmahoney@cftc.gov | |