IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

COMMODITY FUTURES TRADING      )
COMMISSION,                    )
                               )
          Plaintiff,           )
                               )
     v.                        )      11-cv-10949-LPZ-MKM
                               )
ALAN JAMES WATSON, MICHAEL POTTS )
and CASH FLOW FINANCIAL LLC,   )
                               )
          Defendants,          )
                               )
and                            )
                               )
THE JEDBURGH GROUP,            )
                               )
          Relief Defendant     )
_____

**CONSENT ORDER OF PERMANENT INJUNCTION, CIVIL MONETARY
PENALTY AND FOR OTHER EQUITABLE RELIEF
AGAINST ALAN JAMES WATSON**

On March 10, 2011, Plaintiff Commodity Futures Trading Commission (the

"Commission" or "CFTC") filed a Complaint against Defendants Alan James Watson

("Watson"), Michael Potts ("Potts"), and Cash Flow Financial LLC ("CFF"), and against

Relief Defendant The Jedburgh Group ("Jedburgh").  The Complaint seeks injunctive and

other equitable relief for violations of the Commodity Exchange Act ("Act"), as amended by

the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the

CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101 – 13204, 122 Stat. 1651, to be

codified at 7 U.S.C. §§ 1 *et seq.*

## I.    <u>CONSENTS AND AGREEMENTS</u>

To effect settlement of the matters alleged in the Complaint in this action prior to a trial on the merits or further judicial proceedings, Watson:

1.    Consents to the entry of this Consent Order of Permanent Injunction, Civil Monetary Penalty and For Other Equitable Relief ("Order");

2.    Affirms that he has read and agreed to this Order voluntarily, and that no threat or promise, other than as set forth specifically herein, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce his consent to this Order;

3.    Acknowledges service of the Summons, Complaint and this Order;

4.    Admits the Court's personal and subject matter jurisdiction over him and this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006);

5.    Admits that venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006).

6.    Waives:

a.    All claims that may be available to him under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1, *et seq*. (2011), relating to, or arising from, this action and any right pursuant to EAJA to seek costs, fees and other expenses relating to or arising from this action;

b.    All claims that may be available to him under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to or arising from this action;

2

       c.      Any claim of Double Jeopardy based upon the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief; and

       d.      All rights of appeal in this action.

7.      Agrees that he will not oppose enforcement of this Order on the ground that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waive any objections based thereon.

8.      Consents to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Order, assuring compliance with this Order, determining the amounts of restitution, disgorgement, and civil monetary penalties to be paid by him, and for any other purpose relevant to this action, even if he now, or in the future, resides outside the jurisdiction.

9.      Agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint, or creating, or tending to create the impression that the Complaint or this Order is without a factual basis; provided, however, that nothing in this provision shall affect his (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party.  He shall take all steps necessary to ensure all of his agents and employees comply with this provision.

10.      Agrees to cooperate with the Commission staff in the continuing litigation of this matter against any Defendant or Relief Defendant not a party to this Order.  As part of such cooperation, he agrees, subject to all applicable privileges, to comply fully,

3

promptly and truthfully with any reasonable inquiries or requests for information or testimony, including but not limited to, testifying at any trial or hearing in this action subject to the provisions of paragraph 9 above, or producing written statements or trial declarations to the Commission related to any trial of the subject matter of this proceeding.

11.     Neither admits nor denies the allegations of the Complaint and the Findings of Fact and Conclusions of Law contained in this Order, except as to jurisdiction and venue, which he admits.  However, he agrees and intends that the allegations of the Complaint and all of the Findings of Fact and Conclusions of Law contained in this Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of any subsequent action to enforce the terms of this Order and any bankruptcy proceeding filed by, on behalf of, or against him.  No provision of this Order shall in any way limit or impair the ability of any person to seek any legal or equitable remedy against him, or any other person in any other proceeding.

12.     Agrees to provide immediate notice to this Court and the CFTC by certified mail of any bankruptcy proceeding filed by, on behalf of, or against him.

13.     Agrees that he will provide notice to this Court and the CFTC by certified mail of any change to his contact telephone number(s) and/or mailing address(es) within ten (10) calendar days of the changes(s).

4

## II.    FINDINGS AND CONCLUSIONS

### A.  Findings of Fact

**Plaintiff**

1.    **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended by the CRA and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 *et seq.*, and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2011).

**Consenting Defendant**

2.    **Defendant Alan James Watson** is an individual who resides in Clinton Township, Michigan, and controlled the day to day operations of a commodity pool operated under the guise of Cash Flow Financial LLC.  Watson has never been registered with the Commission as a Commodity Pool Operator or in any other capacity.

**Formation of the Pool**

3.    Section 1a of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 1a, defines a "commodity pool operator" ("CPO") as any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise and in connection therewith, has solicited, accepted or received funds, securities or property from others for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

5

4.      On or about January 28, 2004, Watson formed CFF as a Michigan limited liability company.

5.      By at least November 27, 2007, Watson began soliciting pool participants to participate in an "investment club" operated through CFF for the purpose of forming a commodity pool to be traded by a Florida-based entity called Trade LLC.

6.      Between November 27, 2007, and June 30, 2009, CFF had more than 600 pool participants throughout the United States and received at least $44 million in funds for trading and investment.

7.      Watson acted as the CPO of this pool.  As a CPO, Watson owed a fiduciary duty to disclose all material information to his clients, the CFF pool participants.

8.      Watson solicited pool participants through instrumentalities of interstate commerce, including telephone lines, and received funds from such individuals through the mail and other instrumentalities of interstate commerce.

9.      The CFF Operating Agreement, which Watson and each pool participant signed and which sets forth the agreement between all CFF pool participants, states that Watson as CEO is granted

> the power and authority to open and manage one or more brokerage or investment accounts on behalf of CFF-LLC.  Notwithstanding this power and authority, such brokerage or investment accounts will be managed in accordance with an investment strategy proposed by the CEO, and approved by two-thirds majority of the Members ("Investment Strategy").

10.     The "Investment Strategy" as agreed to by the pool participants and posted on the CFF website was to pool their funds to trade futures and equities on an intraday basis with the aid of a system developed by Trade LLC.

6

11.    Watson, as CEO of CFF, provided trading advice to the pool regarding trading commodity futures and securities.  Under the agreement, all CFF expenses and any compensation to be paid to CFF and/or Watson, were to be paid from a 20% commission on all *profits* generated by the CFF pool's trading activity.

12.    Although Watson had represented that all pool participant funds would be traded using Trade LLC's program, Watson provided only a portion of the pooled funds to Trade LLC for the purpose of trading futures and/or securities.

13.    Contrary to the representation that all pool participants' funds would be traded using the Trade LLC program, Watson actually deposited a portion of the pool's funds in his own personal accounts opened under his own name at Alaron Trading Corporation, Account No. 5250xxxx (the "Alaron Account") and at TradeStation Securities, Account No. 2107xxxx (the "TradeStation Account").  Alaron and TradeStation are Futures Commission Merchants ("FCMs") registered with the CFTC. Watson traded commodity futures, specifically E-mini S&P 500 futures, with pool participants' funds in his personal accounts at Alaron and TradeStation.

14.    Watson also deposited a portion of pooled CFF funds in an account in CFF's name with TD Ameritrade, Account No. 788-90xxxx (the "TD Ameritrade Account"), for the purpose of trading securities.  Watson executed trades for the TD Ameritrade Account himself without CFF pool participant approval or notice.

15.    Throughout the entire period when Watson accepted funds from pool participants, Watson did not register in any capacity with the Commission.

**Fraudulent Solicitations**

16.     During the period November 27, 2007 through June 30, 2009, Watson directly and indirectly solicited more than $44 million from pool participants.

17.     Watson directly solicited pool participants through monthly conference calls and/or webinars occurring on the first Wednesday of each month beginning at least by May 2008.

18.     Watson directly solicited pool participants at an event held in Perrysburg, Ohio on or about September 5-6, 2008.

19.     Watson directly solicited pool participants at an open house hosted at Trade LLC's headquarters in Palm Beach Gardens, Florida, on March 28, 2009 – more than 2 weeks after Watson stopped depositing funds with Trade LLC.

20.     Watson directly solicited pool participants via promotional materials posted on the CFF website.

21.     Watson indirectly solicited pool participants through a series of "Executive Club Members" or "ECMs," who acted under Watson's and Potts' direction in identifying and soliciting new participants and were compensated in a manner similar to a multi-level marketing program.

22.     The CFF Operating Agreement stated that CFF pool participant funds would be traded using a trading program selected by the CEO and approved by a vote of two-thirds of the members.  The pool participants approved the pooling of their funds for trading in commodity futures and securities with Trade LLC.

23.    In all of the materials, e-mails, meetings, and webinars that Watson used to solicit pool participants, he represented that all CFF pooled funds would be traded using the Trade LLC programs.

24.    All of the pooled funds were to be traded through one of two programs:

a.    The "Loan Program" allowed pool participants to provide a short term "loan" (ranging from 3 to 9 months) to Trade LLC in return for a fixed rate of return of 2% to 4.5% each month.  Funds deposited for the "Loan Program" were to be provided by CFF to Trade LLC to use for trading futures and/or securities until CFF could accumulate enough funds to begin actively trading in its own account.  Watson represented to many of the pool participants that participation in the "Loan Program" was necessary in order to comply with federal statutes regarding investment clubs.

b.    The "Trading Program" purportedly generated higher rates of return for pool participants (*i.e.*, 8% to 10% monthly).  Watson represented that the funds deposited in the "Trading Program" would be placed in a CFF account at Alaron, and Trade LLC would be given authority to execute trades in futures and/or securities in the account.  Watson further represented that Trade LLC would not be able to withdraw funds from the account.  This fact was emphasized as a way that pool participants could be assured that their money was actually being traded and could not be stolen by Trade LLC – a fact that was material to many CFF members who had previously been solicited by Watson and lost substantial sums of money by investing in a Ponzi-like scheme involving a fraudulent scheme known as Safevest LLC.

25.    Many pool participants initially deposited funds in the "Loan Program" and when the return of the principal and purported profit became due and payable by

9

Trade LLC, Defendants persuaded them to roll those funds over into the "Trading Program" with Trade LLC.

26.    At a minimum, Watson made the following false or misleading representations in his solicitations:

a.    Watson falsely claimed to be in compliance with CFTC registration requirements, when he was not;

b.    Watson falsely claimed that all of the funds deposited into the CFF pool would be employed in either the "Loan Program" or "Trading Program" with Trade LLC, when they were not;

c.    Watson falsely claimed that the funds deposited in the "Trading Program" would not be provided directly to Trade LLC, but instead would be put in a brokerage account at Alaron, and Trade LLC would be given access and authority to execute trades in the account.  These assertions were false because: (i) to the extent any funds were traded using the Trade LLC program, they were given directly to Trade LLC, (ii) no account was ever opened at Alaron in CFF's name, and (iii) Trade LLC was never given legal authority to access and execute trades in Watson's personal Alaron account or any account in Watson's or CFF's names;

d.    Watson falsely claimed that he was allowing Trade LLC to trade futures using his own money to test their program, when in fact he used CFF pool participant funds to trade futures in an account in his own name and never legally gave Trade LLC discretionary trading authority over that account;

e.    Watson falsely claimed that CFF was earning profits of at least 10% or more each month before fees, when it was not;

10

f.      Watson falsely claimed in late May 2009 that he was going to stop accepting new pool participants effective June 1, 2009, because: (i) he was in the process of hiring an accountant and needed a clean break to allow them to take over the books, (ii) he wanted more time to find bigger and better "bonus type deals," and (iii) he wanted to prove once and for all that CFF was not a Ponzi scheme and could survive without additional infusions of cash.  In fact, Watson failed to provide an accounting to CFF pool participants and had started realizing the losses incurred through his various schemes and needed an immediate influx of cash before investors learned of his deception and stopped the money flow.

27.     In addition to making affirmative false statements, Watson omitted material facts from his clients, including but not limited to the following:

a.      Watson failed to disclose that he had begun investing CFF pool participant funds in a variety of unauthorized schemes other than Trade LLC as early as March 2008;

b.      Watson failed to disclose that none of the funds deposited into the CFF pool on or after March 12, 2009 were traded by Trade LLC and instead were used in unauthorized schemes or otherwise misappropriated.  Notably, during the March 28, 2009 open house hosted at Trade LLC's headquarters in Florida, Watson failed to disclose to prospective and current pool participants that he had stopped sending funds to Trade LLC two weeks earlier, or that he had previously filed a lawsuit on behalf of CFF in an attempt to recover funds invested in an unauthorized scheme wholly unrelated to Trade LLC;

c.      Watson failed to disclose that the CFF pool was losing money, both through his unapproved investments and through Trade LLC; and

11

d.     Watson failed to disclose that he was using pool participants' funds to pay principal and purported profit returns to existing pool participants in a manner typical of a Ponzi scheme.

**Misappropriation**

28.     Watson misappropriated pool participant funds in a variety of ways.  Of the more than $44 million solicited, only $8.1 million was traded by Trade LLC.  The remainder was deposited at the direction of Watson in unapproved trading accounts or schemes, used to reimburse money lost by individuals in a prior Ponzi scheme involving Safevest LLC, used to reimburse current pool participants purported profits and principal without accounting for losses incurred by the pool, to pay excessive commissions to Watson, Potts and other ECMs, and for Watson's and his family's day to day living expenses.

29.     For example, Watson represented to existing and prospective pool participants that CFF would be paid a commission of 20% of the profits from the CFF pool's trading using the Trade LLC program.  CFF's operating expenses and compensation for Watson, Potts, and Executive Club Members, if any, was to be paid out of that 20% commission.  Watson, however, paid fees and commissions in excess of the 20% agreed upon to himself, Potts, and ECMs, without respect to the profitability of CFF or the purported profitability of CFF pool funds.

30.     Watson paid his own personal expenses directly from the CFF bank account, including payments on the mortgage for his home, daily purchases of food and gas, regular ATM cash withdrawals, as well as purchases at places such as Smokers

Express, Toys R Us, Kmart, and General RV Center.  Watson has misappropriated at least $100,000 for his own use and that of his friends and family members.

31.    Watson misappropriated pool participant funds when he used them to return other pool participants deposits and reimburse other pool participants purported profits when little or no actual profits had been generated.

32.    Watson misappropriated pool participant funds when he returned funds that had been invested and lost in a prior Ponzi scheme involving Safevest.  Watson distributed at least $325,000 of pool participants' funds to non-pool participants as "return of principal" invested in Safevest.

33.    No futures accounts were ever funded and traded in CFF's name.

34.    Instead, Watson misappropriated CFF pool participant funds when he used them to open the Alaron and TradeStation accounts in his own name and for his own benefit.  Watson made trading decisions and actively traded futures in those accounts himself, as well as giving trading authority to unauthorized persons including a company known as Temple FX, which is not registered with the Commission, and an individual named Stanley Williams, who were not approved by CFF pool participants as required by the CFF Operating Agreement.

35.    Contrary to his representations and the marketing materials provided on the CFF website that all pool funds would be traded using the Trade LLC program, Watson only provided a small amount of pool funds directly to Trade LLC to be traded in futures and/or securities.

13

36.     Watson further misappropriated pool participant funds by investing participant funds in a variety of unauthorized investment schemes, including, but not limited to, the following:

a.     In July 2008, Watson invested $1 million of CFF pool participant funds in a California based scheme to invest in U.S. Treasury instruments with Blue Diamond Excavation, Olathe Mining Company and Sundial Investment Group LLC (*Watson and Cash Flow Financial LLC v. Blue Diamond Excavation, Inc.*, No. 8:10-cv-00459 (C.D. Cal.));

b.     In September 2008, Watson invested $650,000 of CFF pool participant funds in an Arizona based money leasing scheme operated by Charles Bruce Ferguson.  *See Arizona v. Ferguson*, No. 64 SGJ (Ariz. Sup. Ct., Maricopa County);

c.     In October 2008, Watson invested $1 million of CFF pool participant funds in a California based money leasing scheme involving Soldado Corporation.  *See Watson and Cash Flow Financial LLC v. Soldado Corp.*, No. 10-CV-1394 (N.D. Cal.);

d.     Beginning in December 2008, Watson invested $4,850,000 of CFF pool participant funds in a money leasing scheme with Darlene Bishop and Paradize Funding Network in Texas.  *See Cash Flow Financial LLC v. Bishop*, No. 09-CV-00029 (W.D. Tex.); and

e.     By at least June 2009, Watson invested approximately $3 million of CFF pool participant funds with a group of individuals and entities including Jason Meyer, M5 Enterprises LLC, Royal Sovereign Group, and 3 Hooligans Investment Properties in connection with a money leasing program for the purpose of ultimately

14

investing in U.S. Treasury instruments. *See Cash Flow Financial LLC v. Meyer*, No. 2:09-CV-05002 (E.D.N.Y.).

37.     Watson invested CFF pool participant funds in additional unauthorized schemes that are not yet the subject of litigation.

38.     Watson did not begin disclosing the existence of these other investments until 2010, even though he initiated litigation on behalf of CFF to recover the funds as early as March 27, 2009.

**Fraudulent Account Statements**

39.     From at least November 27, 2007, when Watson began pooling CFF participant funds, until July 23, 2009, Watson issued monthly account statements to participants.  Those statements falsely indicated that the pool participants were profiting at a rate of 10% per month as a result of participating in the Trade LLC Trading Program.

40.     The statements reflected Promissory Note or Loan Program participation and "Trade" Program participation, but failed to disclose the other investments made by Watson with CFF pool participant funds.

41.     Watson knew that the account statements were untrue, or was reckless with regard to their truthfulness, because he was aware that (1) only a small portion of pool participant funds was actually traded using the Trade LLC program, and (2) the pool was incurring significant losses as a result of Watson's investments in schemes unrelated to Trade LLC and was not profitable.

42.     Watson directed persons affiliated with Trade LLC to refrain from providing any statements directly to CFF pool participants and from providing

information regarding the total amount deposited with Trade LLC by the CFF pool in order to hide the unauthorized investments and substantial losses incurred by Watson.

**The Cover Up – Additional False Statements Defrauding Pool Participants**

43.     Throughout July 2009, many CFF pool participants requested withdrawals of their funds and/or profits.  Watson deflected many of those requests, claiming that he was unable to access CFF accounts because he was traveling with his family in an RV and driving cross-country.

44.     During this same time period, however, Watson charged his family's hotel stays at a Disney resort to the main CFF bank account, paid for RV expenses from the CFF bank account and executed wire transactions transferring more than $1.2 million out of the main CFF bank account to various sources.

45.     In April and May 2010, Watson caused to be issued 2009 Schedule K-1's to CFF pool participants reflecting profits on investment through at least the end of May 2009, when he knew that CFF pool participants had not in fact profited, but instead had suffered substantial losses.

46.     Throughout April and May 2010, Watson promised CFF pool participants a full accounting of pooled funds and repeatedly promised that funds would be returned in the near future.

**B.  Conclusions of Law**

1.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order there under.

2.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Watson is found in, inhabits, or transacts business in this District, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

3.      By the conduct described in Section II.A above, Watson, knowingly or with reckless disregard for the truth, violated Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), and Section 4b(a)(2) of the Act, 7 U.S.C. § 6(b)(a)(2) (2006) with respect to acts occurring before June 18, 2008, and Section 4b(a)(1) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6(b)(a)(1), with respect to acts occurring on or after June 18, 2008, by (1) falsely representing that all funds deposited with CFF would be traded by Trade LLC; (2) misappropriating pooled funds for non-approved schemes and investments; (3) issuing fraudulent account statements that falsely represented that pool participant funds were being traded profitably; (4) misappropriating pool participant funds for business expenses and for personal use; (5) misappropriating pool participant funds by using such funds to pay principal and purported returns to other pool participants; and (6) omitting material information, including the fact that he was misappropriating pool participant funds.

4.      By the conduct described in Section II.A above, Watson also violated Section 4m(1) of the Act, 6 U.S.C. §6m(1) (2006), because he failed to register as a Commodity Pool Operator and failed to register as an associated person of a Commodity Pool Operator.

17

### III.    PERMANENT INJUNCTION

This Court, being fully advised in the premises, finds that there is good cause for the entry of this Order and that there is no just reason for delay.  This Court therefore directs the entry of a permanent injunction, orders Watson to pay restitution, disgorgement, and a civil monetary penalty in amounts to be determined at a later date, and orders other equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), as set forth herein.

A.    **IT IS HEREBY ORDERED** that Watson, along with any of his agents, servants, employees or assigns and persons in concert or participation with them who receive actual notice of this Order by personal service or otherwise, and all other persons or entities served with a copy of this Order, are permanently restrained, enjoined, and prohibited from directly or indirectly:

1.    employing a device, scheme, or artifice to defraud any client or participant or prospective client or participant; or to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant, in violation of Section 4o(1) of the Act, as amended by the CRA and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010) ("Dodd-Frank"), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. § 4o(1), including but not limited to, conduct such as that set forth in Section II.A. above; and

2.    in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is

18

made, or to be made, on or subject to the rules of a designated contract market, for or on

behalf of any other person

      (A)     to cheat or defraud or attempt to cheat or defraud the other person;

      (B)     willfully to make or cause to be made to the other person any false

             report or statement or willfully to enter or cause to be entered for

             the other person any false record; or

      (C)     willfully to deceive or attempt to deceive the other person by any

             means whatsoever in regard to any order or contract or the

             disposition or execution of any order or contract, or in regard to

             any act of agency performed, with respect to any order or contract

             for, in the case of paragraph (2), with the other person;

in violation of Sections 4b(a)(1)(A)-(C) of the Act, as amended by the CRA and the

Dodd-Frank Act, to be codified at §§ 6b(a)(1)(A)-(C), including but not limited to,

conduct such as that set forth in Section II.A. above.

     **B.**     **IT IS HEREBY ORDERED** that Watson is permanently restrained,

enjoined, and prohibited from directly or indirectly:

     1.     Trading on or subject to the rules of any registered entity as that

term is defined in Section 1a of the Act, as amended by the CRA and the Dodd-Frank

Act, to be codified at 7 U.S.C. § 1a;

     2.     Entering into any transactions involving commodity futures, options

on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1),

17 C.F.R. § 32.1(b)(1) (2011)) ("commodity options"), swaps, and/or foreign currency (as

described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the CRA and

the Dodd-Frank Act, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex

contracts") for his own personal account, proprietary account or for any account in which he

has a direct or indirect interest;

       3.    Having any commodity futures, options on commodity futures,

commodity options, swaps, and/or forex contracts traded on his behalf;

       4.    Controlling or directing the trading for or on behalf of any other

person or entity, whether by power of attorney or otherwise, in any account involving

commodity futures, options on commodity futures, commodity options, swaps, and/or

forex contracts;

       5.    Soliciting, receiving or accepting any funds from any person for

the purpose of purchasing or selling any commodity futures, options on commodity

futures, commodity options, swaps, and/or forex contracts;

       6.    Applying for registration or claiming exemption from registration

with the Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission except as provided for

in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011);

       7.    Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2011)), agent or any other officer or employee of any person (as that

term is defined in Section 1a of the Act, as amended, to be codified at 7 U.S.C. § 1a)

registered, exempted from registration or required to be registered with the Commission

except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

       8.    Engaging in any business activities related to commodity interest

trading.

     **C.**    **IT IS HEREBY FURTHER ORDERED** that the injunctive provisions of this Order shall be binding upon Watson, upon any person who acts in the capacity of agent, employee, attorney, and/or assign of Watson and upon any person who receives actual notice of this Order, by personal service or otherwise, insofar as he or she is acting in active concert or participation with Watson.

## IV.    RESTITUTION, DISGORGEMENT AND CIVIL MONETARY PENALTIES

**IT IS HEREBY ORDERED** that Watson shall comply fully with the following terms, conditions and obligations relating to the payment of restitution, disgorgement, and a civil monetary penalty:

     **A.**    **Restitution and Disgorgement**

     1.    Watson shall pay full restitution and disgorgement, plus post-judgment interest, in an amount to be determined by agreement between the CFTC and Watson within ninety (90) days of the winding up of the court-appointed receivership in this case, or as soon as possible thereafter by the Court after an evidentiary hearing.

     2.    Post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

     3.    To the extent that any funds accrue to the U.S. Treasury as a result of Watson's restitution obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in paragraph A.4 of this Section.

     4.    The procedure for the payment and distribution of restitution and disgorgement shall be determined by the Court at a later date.

**B.**     **Civil Monetary Penalty**

1.     Watson shall pay a civil monetary penalty, plus post-judgment interest, in an amount to be determined by agreement between the CFTC and Watson within ninety (90) days of the winding up of the court-appointed receivership in this case, or as soon as possible thereafter by the Court after an evidentiary hearing.  Post-judgment interest shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

2.     Watson shall pay this civil monetary penalty by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN:  Accounts Receivables --- AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, Oklahoma 73169
> Telephone: 405-954-5644

If payment is to be made by electronic funds transfer, Watson shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  Watson shall accompany payment of the penalty with a cover letter that identifies the paying Defendant and the name and docket number of the proceedings.  Watson shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures

22

Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, and the Chief, Office of Cooperative Enforcement, at the same address.

### C.   Partial Payments

Any acceptance by the Commission of partial payment of Watson's restitution obligation, disgorgement obligation, and/or civil monetary penalty shall not be deemed a waiver of the respective requirement to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## V.   <u>MISCELLANEOUS PROVISIONS</u>

**IT IS FURTHER ORDERED THAT:**

1.   Jurisdiction:  This Court shall retain jurisdiction of this case to determine the amount of Watson's restitution, disgorgement, and civil monetary penalty obligations, assure compliance with this Order and for all other purposes related to this action.

2.   Interpretation and Enforcement:  This Order shall be interpreted and enforced according to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Eastern District of Michigan, and all provisions of the Act and Commission Regulations, relating or referring to the obligations hereunder.

3.   Notices:  All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to the Commission:
Attention - Director of Enforcement
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street N.W.
Washington, DC 20581

23

4.      Waiver:  The failure of any party to this Order or of any participant/investor at any time to require performance of any provision of this Order shall in no manner affect the right of the party or participant/investor to enforce the same or any other provision of this Order at a later time.  No waiver in one or more instances of the breach of any provision contained in this Order shall be deemed or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Order.

5.      Acknowledgements:  Upon being served with a copy of this Order after entry by this Court, Watson shall sign an acknowledgment of service and serve the acknowledgment on this Court and the CFTC within seven (7) calendar days.

6.      Invalidation:  If any provision or the application of any provision of this Order is held invalid, the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

7.       Entire Agreement and Amendments:  This Order incorporates all of the terms and conditions of the settlement among the parties hereto.  Nothing shall serve to amend or modify this Order in any respect whatsoever, unless:  (1) reduced to writing; (2) signed by all parties hereto; and (3) approved by order of this Court.

8.      Counterparts and Facsimile Execution.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Agreement that is delivered by any means shall be deemed for

24

all purposes as constituting good and valid execution and delivery by such party of this

Agreement.


**Done and Ordered this 5**[TH]  **day of  January 2012.**



                                        s/Lawrence P. Zatkoff
                                        **U.S. DISTRICT JUDGE**

**Consent Order of Permanent Injunction, Civil Monetary Penalty  and For Other**

**Equitable Relief Against Alan James Watson consented to and approved for entry**

**by:**

/s/ Alan J. Watson (w/permission)                          Dated: December 22, 2011
ALAN JAMES WATSON
Defendant


/s/ Allison Baker Shealy                                   Dated: December 22, 2011
Allison Baker Shealy (VA 46634; DC 478202)
Jason A. Mahoney (DC 489276)
Attorney for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street, N.W.
Washington, DC 20581